LOB RANO, Judge.
Defendant, Norris James, was charged by grand jury indictment with two counts of first degree murder, a violation of Louisiana Revised Statute 14:30.
Defendant was arraigned on March 24, 1981 and pled not guilty to both counts. The trial court ordered a lunacy hearing. On August 11, 1981 defendant was found insane and unable to assist counsel. A second lunacy hearing was conducted on May 25, 1982 and defendant was found sane and competent. On September 24, 1982, defendant withdrew his former plea of not guilty and entered a plea of not guilty and not guilty by reason of insanity.
Trial was held on January 17-18, 1983. Defendant was found guilty as charged on both counts. The jury was unable to reach a unanimous decision as to the sentence. Thus, the trial court sentenced defendant to life imprisonment without benefit of probation, parole or suspension of sentence on each count to run concurrently. Defendant’s convictions and sentences were affirmed in an errors patent appeal. State v. James, 463 So.2d 742 (La.App. 4th Cir.1985). On June 14, 1991, defendant, pursuant to Lofton v. Whitley, 905 F.2d 885 (5th Cir.1990), was granted a new appeal.

FACTS:

On February 22, 1981, Sandra James, defendant’s estranged wife and her two children from a previous marriage, were residing at 3038 St. Roch Avenue. Defendant was residing with his parents. Mrs. James, her children and a few friends were in the house. *205 Joseph Perique, a friend of Mrs. James had agreed to fix a broken window. Mrs. James, Perique and Mrs. James’ two daughters, Troy and Shelly Jones were in the kitchen. Joseph Jones, Mrs. James’ son, was playing in the back yard when he noticed defendant walking toward the house. Joseph shouted to his mother that defendant was outside. Defendant walked in and out of the yard several times before entering the house through the kitchen door. Joseph followed defendant into the house. Once inside the house defendant and Mrs. James began to argue. Defendant demanded to know the identity of Perique and the reason he was in the house. Mrs. James told Perique not to answer. Defendant then shot Mrs. James in the chest with a .38 caliber revolver he had hidden in the pocket of his coat. Defendant then approached Perique, said something to him and then shot Perique. As Perique lay on the floor, defendant shot him again. Defendant then fled to Texas where he attempted to commit suicide by shooting himself in the abdomen.
Sandra James died of a single gunshot wound to the chest which penetrated the aorta and caused her to bleed to death. Pe-rique sustained a gunshot wound to the shoulder which was superficial in nature and one to the chest. The shot to the chest penetrated the heart and liver causing Pe-rique to bleed to death.
Both Drs. Kenneth Ritter and Ignacio Medina, psychiatrists who had examined defendant testified that defendant knew right from wrong at the time of the killings.
Defendant appeals his convictions and sentences asserting the following assignments of error:
1) The evidence was insufficient to sustain the conviction of first degree murder on count one as the evidence failed to establish beyond a reasonable doubt that the defendant had the specific intent to kill or inflict great bodily harm upon Sandra James.
2) The evidence was insufficient in count one to sustain the conviction because the mitigating factors of manslaughter had been established by a preponderance of the evidence.
3) The evidence was insufficient in count two to sustain the conviction because the mitigating factors of manslaughter had been established by a preponderance of the evidence.
4) The trial court erred in failing to grant a challenge for cause for prospective juror Thomas Holden.
5) The trial court gave an erroneous jury instruction with respect to the definition of proof beyond a reasonable doubt.

ASSIGNMENTS OF ERROR 1, 2 AND 3:

The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987); State v. Fuller, 414 So.2d 306 (La.1982).
Nevertheless, the reviewing court may not disregard its duty to consider whether the evidence is constitutionally sufficient simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. Mussall, supra. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. Mussall, supra. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, supra.
Defendant was convicted of first degree murder. First degree murder is:
“... the killing of a human being:
(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person;”
*206 Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the physical criminal consequences to follow his act or failure to act.” La.R.S. 14:10; State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, Lindsey v. Louisiana, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990). Intent may be inferred from the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the finder of fact. State v. Govan, 593 So.2d 833 (La.App. 4th Cir.1992), writ denied, 600 So.2d 654 (La.1992); State v. Rayford, 476 So.2d 961 (La.App. 1st Cir.1985). A specific intent to kill can be inferred from someone pointing a gun at close range and pulling the trigger. State v. Williams, 383 So.2d 369 (La.1980), cert. denied, Williams v. Louisiana, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828 (1981); State v. Procell, 365 So.2d 484 (La.1978), cert. denied, Procell v. Louisiana, 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979).
Defendant argues, in the alternative, that the evidence, at best, supports a finding of manslaughter, not first degree murder. The applicable portion of the manslaughter statute (La.R.S. 14:31) relied on by defendant provides:
“(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood, had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed;”
Because “heat of blood” or “sudden passion” are not elements of the crime but rather factors which serve to mitigate the grade of the offense to manslaughter, the defendant must establish them by a preponderance of the evidence. State v. Lombard, 486 So.2d 106 (La.1986); on remand, 501 So.2d 889 (La.App. 5th Cir.1987), writ den., 506 So.2d 504 (La.1987); State v. Camp, 571 So.2d 195 (La.App. 4th Cir.1990); State v. Silbey, 450 So.2d 710 (La.App. 4th Cir.1984).
Defendant testified on his own behalf.
Defendant testified that he went to his wife’s home to reconcile with her. He testified he had been driving around drinking Old Grand Dad whiskey for several hours. He stated he purchased the gun he had in his pocket for protection several months before. He denied he intended to kill his wife or anyone else. He insisted the gun accidently discharged when his wife and Perique “jumped up and came toward me as I was approaching them.” When asked if either of the victims made a hostile move toward him, defendant answered that they made a “flinching move”. When he went into the kitchen and saw Perique and his wife in the kitchen he lost control. He then stated he remembered shooting them and then left.
On cross examination, defendant admitted he parked his car about one block from the house and gave no explanation as to why. He admitted he had only carried the gun a few times since he purchased it. When asked why he had the gun with him that night, he stated he didn’t know why, he just had it. When asked if he kept his hand on the gun the whole time, he stated he didn’t know. He admitted asking his wife Pe-rique’s identity and of being jealous. He also stated Perique attempted to say something to him but was then shot.
All other eye witnesses refute defendant’s assertion that Mrs. James and Perique attempted to “jump” him.
Joseph Jones, defendant’s step-son testified that when defendant walked into the house he began arguing with Mrs. James. He then shot Mrs. James and began wrestling with Perique. He then shot Perique. After Perique fell to the floor defendant shot him a second time. Joseph stated that defendant had the gun in the right pocket of his coat. Before shooting Mrs. James, Joseph saw defendant point the pocket containing the gun at her.
Rallen Marshall, defendant’s step son-in-law testified that defendant entered the home “furious”. He did not appear drunk and was very coherent. He had his hand in *207 his pocket. He demanded to know the identity of Perique. He took one hand out of his pocket and pushed Sandra. Then he shot her. Then he began scuffling with Perique using only his left hand. Then he shot Pe-rique when he attempted to get up from where he was sitting. After Perique fell to the floor, defendant shot him again.
Shelley Jones, defendant’s step-daughter, testified that she attempted to stop defendant from entering the house but that he forced the door open. Defendant was very angry. He then began arguing with Mrs. James over the identity of Perique. When her mother told Perique not to answer, defendant shot her. No one saw the gun because it was in defendant’s pocket. Defendant did not appear to be drunk. After shooting her mother, he turned and shot Perique. After Perique fell to the floor, defendant shot him again.
Tracy Jones, defendant’s step-daughter, testified that defendant entered the house and began “fussing” and told Perique “Shut up, I don’t’ want to hear sh_t from you,” when Perique attempted to explain why he was in the house. Believing defendant was going to hit her mother, Tracy Jones stepped between them. Then defendant fired the gun. Ms. Jones at first believed she was shot because she fell to the ground with her mother. She then heard two more shots as she lay on the floor talking to her mother. She stated that defendant did not take the gun out of his pocket. She stated Perique was in the house to fix a window that defendant had thrown a vase through several weeks earlier.
Darlene Broussard, a friend of Mrs. James, testified that she and her boyfriend, Gino Severin, were visiting Mrs. James the day of the shootings. She stated they were watching television in the den when defendant entered through the kitchen door. Shelley Jones attempted to stop defendant but he pushed his way in. Mrs. James was by the counter sitting in a chair. Perique was sitting in the corner. Defendant had his hand in his pocket. She stated Mrs. James was shocked and just looked at defendant. Then Mrs. James asked defendant what he wanted and he replied “I came here for you.” Perique asked defendant, “What’s the matter, man?” Defendant then replied, “Just stay out of this, man, Stay out of this.” Defendant then approached Perique. Brous-sard, fearing something terrible was going to happen, stepped from the kitchen doorway into the hallway. She then heard three shots. She testified that defendant did not appear drunk and was very coherent.
Gino Severin, Mrs. James’ cousin, testified that he was sitting in the den when defendant came into the house. Defendant grabbed Mrs. James who was trying to get away from him. Defendant was saying something to Mrs. James, Severin then saw defendant push Mrs. James and shoot her. Defendant then began scuffling with Perique using only one hand. He then shot Perique. As Perique fell defendant shot him again. Severin stated that defendant did not appear drunk.
We conclude that reviewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find that the State proved beyond a reasonable doubt that defendant had the specific intent to kill or inflict great bodily harm on his wife and Joseph Perique and that defendant failed to prove by a preponderance of the evidence that he acted in “sudden passion” or “heat of blood”. This assignment of error is without merit.
ASSIGNMENT OF ERROR J:
Defendant alleges the trial court erred in failing to grant his challenge for cause of prospective juror Thomas Holden. By so doing, defendant was forced to use one of his peremptory challenges to remove Holden from the jury resulting in defendant being forced to accept another juror who had been the victim of an aggravated battery.
Article I, Section 17 of the Louisiana Constitution grants an accused the right to a full and complete voir dire examination and to the exercise of peremptory challenge.
The purpose of voir dire examination is to determine the qualifications of prospective jurors by testing their competence and impartiality. State v. Williams, 457 So.2d 610 (La.1984); State v. Thompson, 495 So.2d 328 (La.App. 4th Cir.1986). The scope *208 of voir dire examination falls within the discretion of the trial judge who is given wide latitude in the regulation of the examination of prospective jurors. Thompson, supra.
Code of Criminal Procedure Article 797(2) allows a defendant to challenge for cause a prospective juror on the ground that the juror “is not impartial, whatever the cause of his partiality.” When ruling on a challenge for cause, the trial judge is vested with broad discretion that will not be disturbed on appeal unless shown to have been abused. State v. Brown, 496 So.2d 261 (La.1986); State v. Sylvester, 400 So.2d 640 (La.1981).
Where an accused has exhausted all of his peremptory challenges before completion of the panel, he is entitled to complain on appeal of a ruling refusing to maintain a challenge for cause made by him. Defendant need only show that the trial judge erred in refusing to maintain a challenge for cause by defendant and that defendant exhausted all of his peremptory challenges. State v. Smith, 491 So.2d 641 (La.1986); State v. Sugar, 408 So.2d 1329 (La.1982).
Defendant asserts that because Thomas Holden indicated that he would not be able to accept the fact that defendant may have been insane at the time of the crime but sane at the time of trial, he should have been excused for cause. We disagree.
The transcript of the voir dire of Holden reveals the following:
BY MR. LARRE:
If we prove beyond a reasonable doubt that Mr. James did not have the mental capacity to commit this crime or as Mr. Tosterud told you, under the State versus MeNorton (sic), he did not know the difference between right and wrong at the time the crime was committed, if we prove that, can you find him not guilty by reason of insanity?
BY MR. HOLDEN (JUROR # 172):
Unaffirmative response.
BY MR. LARRE:
You cannot?
BY MR. HOLDEN:
No.
BY MR. LARRE:
You understand that the Judge is going to tell you that if we carry — that’s the one area of trial we do have a burden to present evidence indeed. If we carry the burden of evidence by psychiatrists or whoever, then the law says you have to find him not guilty by reason of insanity. You cannot do that?
BY MR. HOLDEN:
No.
BY THE COURT:
Why not?
BY MR. LARRE:
We urge a challenge for cause.
BY THE COURT:
Why not?
BY MR. HOLDEN:
Well, no, he should,be — I don’t know, but I just couldn’t—
BY THE COURT:
Well, let me explain this to you. Our legislators, our lawmakers in Baton Rouge have already decided that that is the law. If a person, if evidence is presented, proven that a person is insane under the definition that the Court will give you, you must find him not guilty. You can’t accept that? BY MR. HOLDEN:
No.
BY THE COURT:
You disagree with the law of Louisiana? BY MR. HOLDEN:
No, if he is sane now—
BY THE COURT:
Yes, but a person can be insane and then recover. You see, a person—
BY MR. HOLDEN:
They would have to really prove it to me.
BY THE COURT:
Oh, certainly.
BY MR. HOLDEN:
I mean—
BY THE COURT:
This is the question, if it is proven to you, can you accept that law. That’s all we *209 are asking you, whether you agree with the law or not. You know, there is a lot of laws that we don’t agree with, but we are bound by it. We may not agree with the speed limit, for instance, but we are bound by it. Can you accept the law as given to you by this Court, that’s all we ask.
BY MR. HOLDEN:
Yes.
BY MR. LARRE:
Mr. Holden, you said something that interested me and I an (sic) not trying to pick on you. I just need to find out what you are thinking. You said that if he is here now and he is sane now, that you don’t know if he was sane at that—
BY MR. HOLDEN:
Right.
BY MR. LARRE:
Do you understand that there can be a difference or do you feel like you, the fact that he is here now and being certified same and competent to stand trial that you would be prejudiced against thinking about what he did at the time of the crime?
BY MR. HOLDEN:
I would have to think about it.
BY MR. LARRE:
Well, now is the time to think about it, and I am not being facetious.
BY MR. HOLDEN:
Okay, you would have to prove that he was insane at the time as of right now.
BY MR. LARRE:
Okay, what about — I want to explore your feelings about right now today. In other words, if he is competent to stand trial and sane at this time, does that in any way cause you to predecide whether he was insane at the time of the trial before you hear evidence?
BY MR. HOLDEN:
It could.
BY MR. LARRE:
It could.
BY THE COURT:
Can you agree to take your evidence from the witness stand, keep an open mind until you have heard all of the evidence?
BY MR. HOLDEN:
Yes, yes.
BY MR. LARRE:
Well, Mr. Holden, right now a part of your decision, if I am not correct stop me, part of your decision is the manner in which he reacts today right now before he takes the witness stand?
BY MR. HOLDEN:
Right.
BY MR. LARRE:
And the part right now before he takes the witness stand and before the case is, say that if he can stand trial right now and is sane, then he probably wasn’t sane at the trial of the trial. Is that accurate? BY MR. HOLDEN:
Yes.
BY THE COURT:
I don’t understand it. I am sorry, I didn’t understand that question.
BY MR. LARRE:
I’ll rephrase it. What you are saying is that you have a feeling right now — let me ask you a question. Do you have any feelings right not before any evidence gets put on, do you have any feelings about this man’s mental condition?
BY MR. HOLDEN:
No, I don’t know anything about it, but you would have to prove that he was sane (sic) at the time.
BY MR. LARRE:
That would be my burden.
BY THE COURT:
Which is the jurisprudence.
BY MR. LARRE:
Right, but what I am asking — let me take it a little further, if the Court will allow me. Do you have any — anything or any personal feelings that would make that an undue burden for me to prove?
BY THE COURT:
That’s kind of vague, Mr. Larre.
BY MR. LARRE:
Do you have any feelings in your mind right now that would cause my job of proving beyond a reasonable doubt that he was insane at the time of the crime more *210 difficult that Mr. Tosterud’s job to prove that he is guilty of the crime beyond a reasonable doubt?
BY MR. HOLDEN:
No.
BY MR. LARRE:
Okay. So, in essence, what you are saying, Mr. Tosterud and I are starting off on the same foot right now?
BY MR. HOLDEN:
That’s right.
BY MR. LARRE:
And, that you can assume that he is not guilty?
BY MR. HOLDEN:
Right.
BY THE COURT:
Presume.
BY MR. LARRE:
Excuse me, I’m sorry?
BY THE COURT:
Presume.
Thus, the record reveals that while Holden had some initial reservations on the law concerning the insanity defense, he later stated that he could accept the law as charged by the trial court. In addition, defense counsel was able to elicit from Holden that he presumed defendant was not guilty prior to the trial. Holden further stated that both defense counsel and the state were on the same footing. The state would have to prove the defendant’s guilt beyond a reasonable doubt and the defense would have to prove beyond a reasonable doubt that the defendant was insane at the commission of the crimes. Thus, Holden was sufficiently rehabilitated. The trial court did not err in denying defendant’s challenge for cause.
This assignment of error is without merit. ASSIGNMENT OF ERROR 5:
Defendant alleges the trial court gave an erroneous Cage jury instruction. See, Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). However, in accordance with State v. Dobson, 578 So.2d 533 (La.App. 4th Cir.1991), writ den. 588 So.2d 1110 (La.1991) this court has consistently held that a defendant’s failure to object to such a charge precludes review of this assignment of error. See also, C.Cr.P. Arts. 801 and 841. In State v. Berniard, 625 So.2d 217 (La.App. 4th Cir.1993) this court refused to overrule Dobson.
A review of the record in the instant case indicates that defendant failed to object to the charge. This assignment is without merit.
For the reasons assigned, defendant’s convictions and sentences are affirmed.
AFFIRMED.
BARRY, J., concurs with reasons.